## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ALLAN EARL LUCAS, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: _____ |
| | ) | |
| THE DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| Serve: Hon. Muriel Bowser | ) | |
| Mayor of the District of Columbia | ) | |
| Executive Office of the Mayor | ) | |
| 1350 Pennsylvania Avenue, N.W. | ) | |
| Suite 316 | ) | |
| Washington, D.C. 20004 | ) | |
| | ) | |
| Karl A. Racine, Esquire | ) | |
| Attorney General of the District | ) | |
| Of Columbia | ) | |
| Office of the Attorney General | ) | |
| Government of the District of | ) | |
| Columbia | ) | |
| One Judiciary Square | ) | |
| 441 4th Street, N.W. | ) | |
| Washington, D.C. 20001 | ) | |

## COMPLAINT

Plaintiff Allan Earl Lucas, Jr. ("Lucas"), by counsel, respectfully files this Complaint against defendant District of Columbia for money damages, and states as follows:

## THE PARTIES

1.     Plaintiff Lucas is an adult resident of the District of Columbia, residing at 326 Peabody Street, NE, Washington DC 20011.

2.     Defendant District of Columbia is the governmental entity responsible for overseeing the administration of the District of Columbia Metropolitan Police Department,

District of Columbia Police and Firefighter Retirement Relief Board, and District of Columbia Department of Human Resources.

## JURISDICTION AND VENUE

3.    This Court's jurisdiction is proper pursuant to 28 U.S.C.A. §§ 1331 and 1367.

## FACTS

4.    In May of 1972, Lucas was accepted into the District of Columbia Police Academy as a sworn Cadet. The previous Federal Civil Service competitive system was in effect at that time. He completed his training and began working for the Metropolitan Police Department ("MPD"). This was not a temporary appointment; it was a career appointment.

5.    Lucas served adequately and honorably with the MPD before being inducted into the United States Military during the time of the Vietnam Conflict in December of 1972.

6.    Lucas gave the MPD proper notice of his induction into the military. However, Lucas was never offered or provided any separation counseling as required, nor was he otherwise given any counseling, advice or information regarding his employment rights. Lucas was never informed of his employment right to a military furlough if he was leaving government service to enter directly to military service during time of war.

7.    Inexplicably, although the MPD knew Lucas was leaving to enter the military, he was not afforded a military furlough. Instead, Lucas was coerced into submitting his resignation in January 1973 so that he could enter the United States Marine Corps ("USMC"). The reason for his resignation was noted on the Personnel Action form as "to enter the armed services." Lucas was not fired nor otherwise terminated by MPD prior to entering the military. Lucas entered the Marines on February 3, 1973.

8.     Lucas' military service should have been treated as a military furlough under the District Personnel Manual because Lucas' employer knew that he was leaving federal employment to enter the armed services during war.

9.     Lucas served honorably in the Marines, and he was discharged in February of 1978 with a disability.

10.     Lucas wrote to the MPD on February 15, 1978, within days of his discharge.  In his handwritten correspondence, Lucas stated that he is a disabled veteran who had been previously employed by MPD before he was inducted into the USMC, and he requested "reinstatement" to his previous MPD position.  Lucas chose the term "reinstatement" rather than "restoration" upon erroneous instruction from the Desk Sergeant.  Anyone reading Lucas' letter, should have understood that Lucas was requesting "restoration" after leaving the MPD to serve in the military during the war.

11.     Through subsequent communications with MPD, Lucas was informed that MPD had no record of his having been employed with the department, and on February 17, 1978, MPD denied Lucas' request for restoration to the MPD. Lucas was denied restoration rights to which would have otherwise been available to him because of the MPD's failure to give him a military furlough

12.     At no time thereafter was Lucas advised, informed or otherwise provided information regarding his employment rights or the mechanisms by which he could pursue those rights.  Accordingly, Lucas did not know that this was an adverse personnel decision that could be disputed.

13.     At no time did Lucas clearly or unequivocally waive, relinquish or discharge his right to reemployment which would have allowed him to reenter the MPD without losing any

compensation, benefit(s), or professional advancement opportunities, including but not limited to promotions, or rank and step increases.

14.     As a result of MPD's failure to properly restore Lucas into his prior employment, he was forced to seek other work.   He ultimately joined the U.S. Marshals Service.

15.     When the District's Home rule took effect on January 2, 1980, Lucas lost, albeit unknowingly, all previous federal benefits related to his prior employment with the MPD, because of the separation of federal employment from the new D.C. Municipal government.

16.     Eventually, Lucas returned to employment with the MPD in September 1982 and, despite having been employed by MPD previously, was hired on in a probationary status at a lower salary than he otherwise would have earned as a result of his prior service.  He was also put into the post-home rule District municipal retirement plan as opposed to the federal retirement plan he was entitled to had he properly been granted a military furlough and properly restored to duty with MPD in 1978.   When he rejoined the MPD, Lucas did not know that the District's Home Rule had ended federal civil service in DC or else he never would have went back to his former employment which was now under municipal retirement rules.

17.     Finally learning that he would have to serve many more years in order to be eligible for District retirement, Lucas obtained employment in 1994 as a D.C. Corrections Officer because that position offered Lucas a continuation of eligibility for federal retirement.

18.     In April of 1994, upon acceptance into the D.C. Corrections position, Lucas was reinstated to the Federal Civil Service Law Enforcement retirement system.

19.     Lucas retired from the D.C. Department of Corrections on May 16, 2005.

20.     On the day of his retirement, Lucas had a meeting with Wanda Montcrieff (D.C. Office of Personnel). It was at this time that Lucas discovered that his previous service with the

MPD had in fact been found and recorded by Department of Human Resources ("DCHR"), and the Office of Personnel Management ("OPM"), despite what he was told by the MPD in 1978. Without informing him, Lucas' total service computation sheet was changed to reflect the action of a military furlough, which included stopping Lucas' police service on one date, and starting his active duty service the next.

21.     Lucas' federal retirement benefits were approved by the DCHR in May of 2005. As a result, his OPM total service computation sheet appeared to have been "corrected" to reflect his initial employment with MPD, proving that DCHR actually had a record of his initial service with MPD.

22.     The District Personnel Manual as well as OPM regulations state that under this circumstance, his military duty would count as a continuation of his previous federal employee service with MPD and there would be no requirement to pay for this military service before his retirement.

23.     Lucas' retirement benefits, however, were calculated using his accrued federal service of 29 years, 8 months, 2 days and a monthly annuity of $2,281.46; unknown to Lucas, this data did not reflect the higher salary, rank, or years of MPD service he was entitled to had the original mistake not been made in 1978; nor did the data include interim years of employment that should have been included under the federal system had he been properly restored in 1978.

24.     At some point after Lucas' federal retirement was approved by the District in 2005, Lucas' service computation sheet was audited by OPM.  On February 3, 2007, Lucas received correspondence from the Office of Personnel Management signed by Mr. J.C. Trask, informing him that twenty-two years of his previously credited federal service would not be

eligible for annuity, unless he paid $55,419 plus interest into the federal Civil Service Retirement System immediately. He was also told that his military service time should have been re-deposited and paid for before retiring, and that at 65-years of age, it would be deducted from his computation. This was Lucas' first indication an error had possibly occurred when calculating his federal benefits. At no time prior thereto, did Lucas have any notice that his rights had been impeded, due to the fact that he had not received the requisite exiting counseling in 2005.

25.     On February 9, 2007, Lucas received another letter from OPM, stating that he now owed $5,955.87 because of overpayments made to him due to erroneous DCHR calculations since his retirement in May of 2005, even though that retirement had been approved by DCHR.

26.     Lucas responded to these letters from OPM promptly and requested an investigation be conducted in good faith, although it is unknown whether such an investigation was instituted by OPM or any other responsible agency. Lucas was informed by OPM that $165.00 would be withheld from his monthly annuity until the alleged overpayment was recouped. He received no further contact from OPM, except to state that his retirement was under federal law enforcement provisions from the DC government.

27.     The newly-corrected federal service calculations deprived Lucas of many years of federal retirement eligibility he should have earned. Further, because his benefits were being computed at a lower final salary than he should have been entitled to, Lucas' retirement benefits were substantially lower than what he otherwise would have been entitled to receive.

28.     On March 1, 2007 Lucas' retirement deposit was drastically reduced without explanation.

29.     On or about March 7, 2010, Lucas filed a formal grievance with the D.C. Office of Personnel. See Grievance Letter, Exhibit 1. This formal grievance was in the form of a letter

addressed to Wanda Moncrieff, Human Resource Specialist. Id. The subject of this letter reads: "Official Grievance/Request Investigation." Id. The letter asks that "an investigation be conducted, to get to the bottom of this." Id. The letter further reads "I formally request that the D.C. Office of Personnel (DCHR) and the Mayor's Office conduct an investigation into the grievance. Please notify your superiors of my grievance and complaint. I have served my city and my country honorably. This is not fair to me or my family." Id.

30.     Between March 2007 and March 2010, Lucas contacted OPM and the District of Columbia Retirement Board approximately 52 times. He received nothing but the "run-around," with OPM advising him to speak with DC officials, and *vice versa*.

31.     On or about March, 26, 2010, Lucas submitted another formal grievance to the District of Columbia Retirement Board. See Grievance Letter (without original attachments), Exhibit 2. The letter requests "the correction of and restoration of rights and benefits acquired during my service as an Officer with the Metropolitan Police Department." Id. The letter concludes with the following: "[b]ased upon the above information and attached comments I am requesting that the District of Columbia Retirement Board resolve these inconsistencies and make the appropriate adjustment reflecting my correct retirement agency and lost police benefits." Id.

32.     On or about April 27, 2010, Lucas received a response from the District of Columbia Retirement Board acknowledging his grievance dated March 26, 2010.     See Response, Exhibit 3. The letter states: "DCRB has no authority, however, to either determine eligibility for retirement, which is the responsibility of the Police and Firefighters' Retirement and Relief Board (PFRRB), or to determine employment rights with the District of Columbia Metropolitan Police Department (DCMPD). Id. Consequently, I am forwarding your letter and

its attachments to the PFRRB, with a copy of same to the DCMPD's Human Resources office.
Id.

33.    On or about August 18, 2010, Lucas met with Wanda Montcrieff, Sheila Ford-Haynes (MPD Human Resource Specialist) and Pamela Brown, (Police and Firefighters' Retirement and Relief Board, Assistant Attorney General).    During the meeting, Wanda Montcrieff acknowledged that Lucas had not received proper separation counseling, by the lack of entry of this on his separation form.  Pamela Brown then conceded that Lucas should have been given such counseling by MPD.    Both Pamela Brown and Sheila Ford-Haynes further acknowledged that Lucas had left his employment with MPD for military duty, and had been eligible for military furlough. Sheila Ford-Haynes stated that MPD offered Lucas his job back two-years later in response to his restoration request. Lucas answered that he should have been immediately reemployed with MPD when he requested restoration upon his honorable discharge in 1978, thereby remaining within the federal retirement system, and questioned Sheila Ford-Haynes' response. At this point, Pamela Brown demanded that Sheila Ford-Haynes stop speaking, and ended the meeting by agreeing to further investigate the grievance.

34.    In 2012, on behalf of Lucas, undersigned counsel began to follow up with Pamela Brown.  Specifically, letters to Pamela Brown were sent on February 7, 2012, March 6, 2012, March 28, 2012, and September 20, 2012.

35.    On October 9, 2012, Pamela Brown, as Assistant Attorney Advisor for the D.C. Police and Firefighters' Retirement and Relief Board, responded to Lucas' "correspondence" and indicated that the Police and Firefighters' Retirement and Relief Board had "completed its investigation of the matter presented by Mr. Allan Lucas' former counsel." See Correspondence, Exhibit 4.  The letter indicated that the claims are barred by laches and concluded that it had

been "determined that the D.C. Police and Firefighters' Retirement and Relief Board has no jurisdiction in this matter. Nor does the Board possess any statutory regulatory authority to decide personnel issues, such as determining Mr. Lucas' right to any benefits pursuant to the VRRA and USERRA." Id.

36.     Lucas has exhausted his administrative remedies under the Comprehensive Merit Personnel Act by submitting formal grievances to the D.C. Office of Personnel/District of Columbia Department of Human Resources, District of Columbia Retirement Board, and the D.C. Police and Firefighters' Retirement and Relief Board. The District of Columbia Retirement Board deferred to the D.C. Police Firefighters' Retirement and Relief Board, who in conjunction with DCHR and MPD representatives, then took the position that it does not have jurisdiction over the matter. As such, this action is not preempted by the Comprehensive Merit Personnel Act.

37.     In the event that Lucas has not exhausted his administrative remedies, any further resort to the administrative process would be futile and useless because the D.C. Police and Firefighters' Retirement and Relief Board has already indicated that it does not have jurisdiction over the dispute. The D.C. Police and Firefighters' Retirement and Relief Board has already taken its position on this issue and indicated its unwillingness to reconsider the issue. Moreover, administrative remedies would be inadequate and Lucas would suffer irreparable injury absent immediate judicial review. Lucas is of retirement age and has been diligently attempting to rectify the harm done to him for years to no avail. This matter is ripe for federal judicial review.

38.     On February 4, 2013, Lucas filed a federal lawsuit in this Court against the District of Columbia arising out of the foregoing facts. See Lucas v. District of Columbia, No.: 13-00143. That action was dismissed without prejudice on September 30, 2015.

39.     Lucas continues to be deprived of the retirement benefits he rightfully earned in over 30 years of honorable federal and military service.  To wit, Lucas did not receive proper credit for his actual 33 years of service, and he was forced to complete *four* additional probationary periods during that time instead of the customary one, which improperly and unnecessarily decreased the salary Lucas was earning at the time of his retirement in 2005. Additionally, due to his term of initial service with MPD he would not have been removed from the federal retirement system, as he should have been "restored" as an MPD employee under the federal retirement system before District of Columbia home-rule took effect.

## COUNT I
### (Entitlement to Back Pay and Attorney's Fees Pursuant to 5 U.S.C.A. § 5596)

40.     Lucas hereby incorporates paragraphs 1-39 as if fully stated herein.

41.     Lucas was the recipient of unjustified and unwarranted personnel actions, which have resulted in the withdrawal and reduction of his pay, allowances, and benefits.

42.     As per § 5596, Lucas is entitled to receive an amount equal to the salaries, titles, promotions, and benefits of which he was deprived, including the amount he was denied due to an improperly reduced retirement benefit.

43.     Lucas is also entitled to attorney's fees associated with this matter.

## COUNT II
### (Entitlement to Compensation for Loss of Wages and Benefits Pursuant to former 38 U.S.C.A. § 2201, *et seq.* Vietnam Veterans Reemployment Rights Act)

44.     Lucas hereby incorporates paragraphs 1-43 as if fully stated herein.

45.     Lucas' initial service with MPD was unlawfully ended in 1973 when he entered military service with USMC.  He was honorably discharged from the USMC in 1978.

46.     Reemployment with MPD was not impossible or unreasonable, nor would MPD have suffered any undue hardship by reemploying Lucas.

47.     Per former 38 USC § 2021, et seq., Lucas retained reemployment rights which should have yielded him proper benefits, compensation, advancement opportunities, etc., due to him had he been properly reinstated to his former employment by MPD.

48.     Per former 38 USC § 2023(a), Lucas is entitled to receive an amount equal to the salaries, wages, and all other benefits of which he was deprived, including the amount he was denied due to an improperly reduced retirement benefit.

## COUNT III
### (Breach of Contract)

49.     Lucas hereby incorporates paragraphs 1-48 as if fully stated herein.

50.     The District Personnel Manual ("Manual") was applicable to Lucas when he was employed by MPD from 1972 to 1973.  The Manual was incorporated into the terms of Lucas' employment at that time.

51.     Chapter 8, Subpart 12.2(G)(2) of the Manual states that before an employee leaves for military duty, the employee is to be informed of his/her restoration rights, including how to exercise the rights, time limits applicable to the rights, and how, where and when to appeal to obtain those rights.  Lucas was never given such counseling, even though his superiors were aware he was leaving MPD in 1973 in order to join the USMC, and that such reason is reflected on his paperwork.

52.     Chapter 8, Subpart 13.1(A)(1) of the Manual states that an employee who leaves for military duty is entitled to restoration rights upon his or her return: "that when restored to his or her employment status [the position] is the same as if the employee had never left his or her employment."  Lucas was denied such restoration rights.

53.     As a direct and proximate result of defendant's breach of their contractual obligations under the Personnel Manual, Lucas has suffered a tremendous loss of earnings and retirement payments.

54.     Notwithstanding the contractual obligations as set forth in paragraphs 32 and 33, defendant breached its contract with Lucas by failing to provide him the required separation counseling as well as failing to properly restore him to his previous employment upon his honorable discharge from military service.

55.     As a direct and proximate result of defendant's breach, Lucas has been caused to suffer damages; has incurred lost wages; and has lost retirement benefits duly owed.

**COUNT IV**
**(Negligence)**

56.     Lucas hereby incorporates paragraphs 1-55 as if fully stated herein.

57.     Chapter 8 , Subpart 13.3(A) of the District Personnel Manual states, in pertinent part: "Agencies are required to safeguard the rights of employees who are absent because of…military duty…To this end, agencies must…maintain the records necessary to assure that the rights granted these employees by law and regulation are preserved…"

58.     At all times material, defendant had a duty to keep proper records reflecting and related to Lucas' employment within its agencies and to properly calculate his retirement benefits as a result of his service.

59.     Notwithstanding the duties as set forth in paragraphs 38 and 39, defendant breached its duty of care by failing to keep appropriate records of Lucas' employment, failing to properly calculate his benefits, and failing to correct the error when brought to its attention.

60.     As a direct, proximate result of defendant's negligence, Lucas was deprived of full employment salaries, titles, promotions, and benefits.  Such deprivation caused Lucas to

suffer improperly reduced retirement benefits.   Further, as a direct and proximate result of defendant's negligence, plaintiff Lucas suffered a career loss of earnings and retirement payments.

61.    At all times relevant, Lucas has been free of negligence and/or contributory negligence.

WHEREFORE, plaintiff Allan Earl Lucas, Jr. demands judgment against defendant District of Columbia in the sum of Two Million Five Hundred Thousand Dollars ($2,500,00.00), plus pre-judgment interest, post-judgment interest, attorney's fees and costs associated with bringing this action and such further relief which this Court deems appropriate.

**A TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,

**ALLAN EARL LUCAS, JR.**

By: _____
Counsel

David D. Hudgins (DC Bar No.362451)
HUDGINS LAW FIRM, P.C.
515 King Street, Suite 400
Alexandria, VA  22314
(703) 739-3300 telephone
(703) 739-3700 facsimile
dhudgins@hudginslawfirm.com

Dated:   November 25, 2015

March 7, 2007

To: Ms. Wanda Moncrieff
    Human Resource Specialist
    D.C. Office of Personnel
    2008 14th St. N.W. 4th Floor
    Washington, D.C. 20009

From: Allan E. Lucas, Jr.
      3305 11th St. N.W. #1
      Washington, D.C. 20010
      (202) 986-2099

Subj: Official Grievance / Request Investigation

Dear Ms. Moncrieff,

        You completed my retirement package on May 16, 2005
and allowed me to retire from the Federal Civil Service Retire-
ment system under the law enforcement provision. I received my
Federal I.D. card and my monthly retirement checks for almost
2-years. Last month I received notice from OPM, that almost
20-years of my service years are not creditable to federal service.

        This month, my retirement payment was drastically reduced.
I was told that since I received a military furlough, I had
to be restored to continue my original federal benefits. And
that since I was not restored to MPD in 1978, none of my
years of police service since 01/02/73, are creditable towards
my retirement. What is going on, Ms. Moncrieff?

What does OPM mean "by saying "that I recieved a furlough
but was not restored?" You sat with me and went through
my career with me, to certify my years of service. You approved
me for retirement. Now my retirement is being taken away from me.
Something is terribly wrong, and I request an investigation be
conducted, to get to the bottom of this.

I formally request that the D.C. Office of Personnel and the
Mayor's office conduct an investigation into this grievance. Please
notify your superiors of my grievance and complaint. I have
served my city and my country honorably. This is not fair to
me or my family. I am quite sure that Mayor Fenty will not
tolerate the way that I am being treated, and I respectfully request
that your agency head notify him of my Official Grievance.

Please correspond to me in writing, to confirm that you have
received this grievance.

Sincerely Yours,
Allan C. Lucas, Jr.

**ALLAN E. LUCAS, JR.**
**3303 11TH STREET, N.W.**
**WASHINGTON, D. C. 20010-2045**

March 26, 2010

District of Columbia Retirement Board
900 7th Street, N.W.
2nd Floor
Washington, D.C.   20001

**Attn: Member Services**

**Re: Adjustment of Retirement Status**

Dear DCRB Member Services Representative:

Pursuant to my recent telephone conversation with your office, I am hereby requesting the correction of and restoration of rights and benefits acquired during my service as an Officer with the Metropolitan Police Department.

This request is based upon the following relevant facts: (1) On January 4, 1973 after working with the MPD since May 1, 1972 (attachment #1), I notified the MPD of my enlistment into the United States Marine Corps on February 3, 1973; (2) The date of January 20, 1973 was established by MPD as my official date of separation from the agency, instead of the day before my induction date. (3) This created the 10-day break in service between my exit from MPD, and my entry into the United States Marine Corps. (4) I was separated without the benefit of absence for military duty or employment restoration. (5) Due to this adverse action, I was denied restoration to MPD after being honorably discharged. (6) This denial caused me to lose my pre-home rule federal civil service law enforcement retirement and benefits with MPD.

Upon my return to Washington, D.C., after receiving an honorable discharge from the United States Marine Corps,   I went to the MPD to seek restoration rights as an employee returning from active military service with an honorable discharge consistent with the provisions of § 13.1 of the District of Columbia Personnel Manual. At that time I made a request to be reinstated to my previous position as a Police Officer (attachment #2). I was informed that I would receive a response in writing within two weeks. Dated February 17, 1978 I received written notice that my reinstatement was denied (attachment #3). I subsequently followed up on the denial with an actual visit to the Recruiting Department and I was told that no record of my prior service with MPD was on file. They were sorry, but there was no job available for me.

Subsequently, I was fortunate enough to obtain employment with the United States Marshal's Service from 1980-1982 (attachment #4). In 1982 the Metropolitan Police Department contacted me regarding employment and I returned to their employ as a newly recruited Police



Officer under post-home rule District retirement (attachment #4), successfully completed the Police Academy and worked as a District Police Officer until the fall of 1993, when I was reinstated to the federal Civil Service Law Enforcement Retirement System as a D.C. Corrections Officer (attachment #5).

It was not until my retirement in 2005, that I discovered that my original pre-Home Rule federal civil service time *was* listed on my total computation sheet from OPM, and proved that MPD *did* have a record of my original employment in 1972 (attachment #6), and that MPD should have restored me to duty upon my honorable discharge. I had a federal *right to restoration* to my previous MPD employment.

It was not until recently, that I discovered from my original SF 52 from MPD service, that I had been "terminated by military" by MPD in 1973, and that my action was listed as a "resignation," instead of an absence for military duty as required by law. This is the adverse action that created a break-in-service, and a denial of my restoration rights.

Listed on my SF-52 is the information that on May 30, 1973, 4-months after I left for active duty, the MPD initiated a Personnel Action stating that I had been terminated based upon a resignation to enter the armed services instead of being listed as an *Absence by Military Duty* *(attachment #7). This was done, despite the entry clearly stating that* the reason for the action was "to enter the armed forces." Yet no evidence is listed, that I was informed of my right to restoration, or that my employment would be held for me upon my discharge (attachments #8 - #9).

The effect of this was the denial of my restoration rights, thereby adversely impacting the reinstatement of my Civil Service police career, and my inability to retire as a Police Officer with my correct and full Federal Civil Service Law Enforcement benefits.

Based upon the above information and attached documents I am requesting that the District of Columbia Retirement Board resolve these inconsistencies and make the appropriate adjustment reflecting my correct retirement agency and lost police benefits.

Your assistance in this matter is greatly appreciated.

Sincerely,

*Allen E. Lucas*

cc: Senator Mitch McConnell



Member Services
900 7th Street, NW
2nd Floor
Washington, DC 20001
www.dcrb.dc.gov

Telephone (202) 343-DCRB
(866) 456-DCRB
TTY/Federal Relay (800) 877-8339
Facsimile (202) 566-5001
E-mail dcrb.benefits@dc.gov

April 27, 2010

Mr. Allen E. Lucas, Jr.
3303 11th Street, NW
Washington, DC 20010-2045

Dear Mr. Lucas:

This is in response to your letter of March 26, 2010, requesting that DCRB review and adjust your pension under the District of Columbia Police Officers and Firefighters' Retirement Plan (the "Plan") to reflect the District, federal, and military service noted in your letter and its attachments.

As the Plan's Administrator, DCRB has the responsibility to calculate and pay benefits that members have accrued under the provisions of the Plan. DCRB has no authority, however, to either determine eligibility for retirement, which is the responsibility of the Police and Firefighters' Retirement and Relief Board (PFRRB), or to determine employment rights with the District of Columbia Metropolitan Police Department (DCMPD), which is the responsibility of DCMPD. Consequently, I am forwarding your letter and its attachments to the PFRRB, with a copy of same to the DCMPD's Human Resources Office.

In the event that a review by PFRRB and DCMPD of the information you provided in your letter results in changes that affect your pension benefit, PFRRB and/or DCMPD will send that information to DCRB and we will recalculate your benefit.

Should you have questions concerning this matter, please contact me at (202) 343-3238 or at joan.passerino@dc.gov.

Sincerely,

Joan M. Passerino
Chief Benefits Officer

cc: Human Resources Office, MPD (with attachments)
    Police & Firefighters' Retirement and Relief Board (with attachments)



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Police & Firefighters' Retirement
and Relief Board (PFRRB)
441 4th Street N.W.
Suite 340 North
Washington, D.C. 20001

$00.440
MAY 24 2010

2. Article Number
7009 1410 0000 1124 3037

PS Form 3811, August 2001        Domestic Return Receipt

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☑ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

102595-02-M-0754

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

WASHINGTON DC 20001

| | | |
|---|---|---|
| Postage | $ | $1.56 |
| Certified Fee | | $2.80 |
| Return Receipt Fee (Endorsement Required) | | $2.30 |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 |
| Total Postage & Fees | $ | $6.66 |

0220
03
Postmark Here
MAY 13 2010

Sent To  Police & Firefighters' Retirement Relief Board
Street, Apt. No.; or PO Box No.  441 4TH St. N.W. Suite 340 North
City, State, ZIP+4  Wash. DC 20001

PS Form 3800, August 2006

7009 1410 0000 1124 3037

GOVERNMENT OF THE DISTRICT OF COLUMBIA
POLICE AND FIREFIGHTERS' RETIREMENT AND RELIEF BOARD



October 9, 2012

Kathleen A. Wynne, Esq.
Hudgins Law Firm
515 King Street, Suite 400
Alexandria, VA  22314

      Re:   Mr. Allan E. Lucas, Jr., Annuitant
              326 Peabody Street, NE
              Washington, DC  20011

Dear Ms. Wynne:

      The District of Columbia Police and Firefighters' Retirement and Relief Board
("Board") is in receipt of your client's correspondence and has completed its
investigation of the matter presented by Mr. Allan Lucas' former counsel, Karl Carter, Jr.
Mr. Carter requested an adjustment of his client's pension to include his service with the
D.C. Metropolitan Police Department (hereinafter referred to as "DCMPD" or
"Department") during the period of May 1, 1972, through January 1, 1973. This request
was based on the fact the United States Office of Personnel ("OPM") issued a Notice of
Annuity Adjustment to Mr. Lucas on February 5, 2007, decreasing his monthly annuity
because of an overpayment.

### ISSUE PRESENTED

I.   Whether the Annuitant, Allan E. Lucas, Jr., a former employee with the DCMPD
was erroneously denied a military furlough in January 1973, and therefore,
entitled to an adjustment in his pension.

II.  Whether DCMPD erroneously denied Mr. Lucas reemployment with the
Department in February 1978 when he returned from service with the Armed
Forces.

### STATEMENT OF FACTS

      Annuitant, a former Correctional Officer, voluntarily retired from his position
with the D.C. Department of Corrections on May 16, 2005. He was awarded an annuity
in accordance with Civil Service Retirement for Law Enforcement Officers. On February
5, 2007, the U.S. Office of Personnel ("OPM") issued A Special Notice to Annuitant
informing him that his annuity was being reduced because he did not have sufficient
creditable service with the Civil Service Retirement System to justify the payments he



EXHIBIT
4
ALL-STATE LEGAL®

had been receiving. The OPM reduced the annuity to recover overpayments made to Mr. Lucas from the date he received his first annuity payment in 2005 until February 2007. The decreased pension was scheduled to go into effect on March 1, 2007. Mr. Lucas was advised he had a right to file a request for reconsideration within thirty days of OPM's notice.

On April 27, 2010, the District of Columbia Retirement Board ("DCRB") issued a letter to Annuitant, responding to his inquiry requesting that it review and adjust his pension under the District of Columbia Officers and Firefighters Retirement Plan (the "Plan"). According to DCRB's response, on March 26, 2010 Annuitant requested an adjustment of his pension to reflect his District, federal and military service. Ms. Joan Passerino, the Chief Benefits Officer for the DCRB, wrote that the Police and Firefighters' Retirement and Relief Board (the "PFRRB") has the responsibility of determining a member's eligibility for retirement, and that the District of Columbia Metropolitan Police Department ("DCMPD" or "Department") has the responsibility of determining an individual's employment rights with its Department. A copy of Ms. Passerino's April 27, 2010 letter to Annuitant was forwarded to the "Human Resources Office, MPD," and to PFRRB.

On May 13, 2010, Annuitant wrote the PFRRB "requesting help from [our] office" because he was "attempting to correct [his] career-service retirement, due to an adverse action that occurred during [his] service as an Officer with the Metropolitan Police Department." This letter was accompanied by a number of attachments which purports to establish the facts surrounding his employment with the DCMPD, his military service with the United States Marine Corps, and his attempt to obtain reinstatement with the Department after completing his military service. The attachments are listed as follows:

1) Attachment #1:   Personnel Action, dated "04-28-72," which details the appointment of Mr. Lucas to a full-time position with the Department as a Police Officer, subject to the completion of a probationary period;

2) Attachment #2:   A letter to the Department, Recruiting Branch, Inspector Addison Davis, from Mr. Lucas, dated "02-15-78," wherein he requests reinstatement to his previous job.

3) Attachment #3:   A memorandum from Investigator Laurence J. Wade, Recruiting Branch, through Sergeant Donald H. Christian, to Commanding Officer Addison L. Davis, dated "Feb. 17, 1978;"

4) Attachment #4:   Notification of Personnel Action, dated "11-26-80," which details the appointment of Mr. Lucas to the U.S. Marshals Service, as a Deputy U.S. Marshal;

5) Attachment #5:   Personnel Action, dated "05-20-82," which details a Career Service Appointment to the Department as a Police Officer;

In the Matter of Allan E. Lucas, Jr., Annuitant

Page | 3

6) Attachment #6:   Personnel Action, dated "04-26-94," which details the reinstatement of Mr. Lucas to a Career position as a Correctional Officer;

7) Attachment #7:   Certified Summary of Federal Service, Civil Service Retirement System for Mr. Lucas, bearing the following information at the top of the page: "Apr 13 10  11:41 a Lucas Security Sv;"

8) Attachment #8:   Personnel Action, dated "05-30-73," Mr. Lucas' resignation from the Department;

9) Attachments #9 & 10:   Request for Personnel Action, listing the date of request as "01-11-73," detailing Mr. Lucas' resignation from the Department, effective "01-20-73," and processed by the Personnel Office on "5-21-73" and "5-29-73."

On July 29, 2010, Karla Kirby, then Chairperson of the Police and Firefighters' Retirement and Relief Board, issued a response to Annuitant's request for a review and adjustment of his pension under the District of Columbia Police and Firefighters' Retirement Plan.  Mrs. Kirby acknowledged that she reviewed the documents Annuitant submitted in support of his request.  She determined that by affixing his signature to Part II of the SF-52 (Personnel Action) Annuitant acknowledged and accepted the resignation date of January 30, 1973.  Mrs. Kirby also wrote that there was no evidence presented to indicate that Annuitant had requested a military furlough instead of resigning from the Department.

In addition to  the above findings, Mrs. Kirby determined that Annuitant retired from the D.C. Department of Corrections as a Correctional Officer, a position covered under the Civil Service Retirement System for Law Enforcement ("CSRS LE"); that he was employed with DCMPD during three separate periods; and that at the time he resigned from DCMPD on January 20, 1973, he was employed as a Police Cadet, a non-law enforcement position, which was not covered by CSRS LE.

Additionally, Mrs. Kirby determined that Annuitant was employed with the Department during a second period from September 20, 1982, through July 14, 1984.  He resigned and withdrew his retirement contributions from the D.C. Police Officers' and Firefighters' Retirement Plan, a plan separate and distinct from CSRS LE.  This was followed by a third tour of duty with the Department from March 18, 1985, until he resigned in September 1993.  Annuitant received a refund of his retirement contributions from the Plan on November 10, 1993.  Finally, she determined that Annuitant served a total of eleven (11) years and sixteen days under the Police and Firefighters' Plan, but that he did not meet the retirement criteria for an active police officer.  In addition, he did not retain any creditable service under the plan because he had withdrawn his retirement contributions.

On August 17, 2010, Annuitant, participated in an informal meeting with the Attorney-Advisor to the Police and Firefighters' Retirement and Relief Board Pamela Brown.  He was accompanied by his counsel, Mr. Karl Carter and Mr. Michael Davis.

441 4th Street, NW, Suite 330S, Washington, D.C., 20001

In the Matter of Allan E. Lucas, Jr., Annuitant

Also in attendance were Supervisory Human Resource Specialist Sheila Ford, and Human Resource Specialists Alicia Cooper and Wanda Moncrieffe.[1] Annuitant reiterated the information that was previously relayed in his letters to the Board. Mr. Carter provided counsel with case law to support his client's position. On August 19, 2010, Mr. Carter submitted additional copies of the same paperwork to the attention of Ms. Brown for her review. On September 20, 2011, Mr. Carter submitted additional records to the attention of Ms. Brown, including an "Appointment Affidavits," which purports to be an oath of office taken by Annuitant. The words "District of Columbia Government" are typed on the top line, followed by the handwritten words "Metropolitan Police Dept. Wash. D.C.," bearing a date of May 1, 1972. The remaining documents were more legible copies of documents previously submitted for review.

Annuitant maintains he is entitled to creditable civilian service for the period he served with the Department from May 1972 through January 1973, and for his military assignment. Annuitant argues that the Department did not comply with existing federal law when it failed to counsel him regarding his restoration rights. He asserts that this would place him in a position to receive creditable service for the two tours of duty he spent in the military and enable him to collect a higher annuity.

## JURISDICTION

With the implementation of the District of Columbia Home Rule, the Mayor was vested with the authority to administer the personnel functions of the District. The Mayor's authority covers employees from all District departments, boards, commissions, offices and agencies, with some exceptions which are noted in the statute. *See* D.C. Official Code § 1-204.22(3). Personnel legislation enacted by Congress prior to or after January 2, 1975, including, but not limited to legislation pertaining to retirement for all District government employees, was to continue in effect until the newly formed Council could provide coverage under a District government merit system. As a result, individuals employed by the District government preceding the effective date of the legislation continued to participate in the Federal Civil Service System, including its other applicable retirement systems.

The legislative history of this section indicates the District of Columbia Government Comprehensive Merit Personnel Act ("CMPA") was enacted in 1978 pursuant to section 422(3) of the District of Columbia Home Rule Act (87 Stat. 790; Public Law 93-198; D.C. Code § 1-242(3) with respect to the compensation of District of Columbia employees.[2]

D.C. Official Code § 1-602.01 reads as follows:

---

[1] Ms. Ford and Ms. Moncrieffe are no longer employed with the D.C. Department of Human Resources.
[2] Bill No. 2-139 was adopted by the Council on first and second readings on October 17, 1978, and October 31, 1978. The Mayor signed the Bill on November 22, 1978, and it was transmitted to both Houses of Congress for its review. D.C. Code § 1-636.02 states that the CMPA became effective on March 3, 1979. The enactment of Home Rule and the CMPA took place long after Annuitant resigned from his first stint with the Department in January 1973.

(a)   Except as provided in subsection (c) of this section, unless specifically exempted from certain provisions, this chapter shall apply to all employees of the District of Columbia government, except the Chief Judges and Associate Judges of the Superior Court of the District of Columbia and the District of Columbia Court of Appeals and the nonjudicial personnel of said Courts. With the exception of subchapters V and XVII of this chapter, and § 1-608.01(e), employees of the D.C. General Hospital and the D.C. General Hospital Commission shall be exempt from the provisions of this chapter.

(b)   Repealed.

(c)   The provisions of subchapter XV-A shall apply to employees of all District agencies, including, but not limited to employees of subordinate agencies, independent agencies, the District of Columbia Board of Education, the Board of Trustees of the University of the District of Columbia, the District of Columbia Housing Authority, and the Metropolitan Police Department.

The District of Columbia Council enacted the CMPA with the intention of providing District employees with their exclusive remedies for claims arising out of employer conduct in handling personnel ratings, employee grievances and adverse actions. See *District of Columbia v. Thompson*, 593 A.2d 621, 623-24 (D.C. 1991).

D.C. Official Code § 1-604.02 established the Office of Personnel, and permitted the Mayor to delegate his authority exclusively to the Director of Personnel. In addition, the Mayor was given authority to issue rules and regulations to govern the District's personnel, pursuant to D.C. Official Code § 1-604.04.  D.C. Official Code § 1-604.06, specifically places personnel authority for the District of Columbia government with the Mayor, with some exceptions.

In D.C. Official Code § 1-601.01(2) the Council of the District of Columbia promulgated the following:

The provisions of sections §§ 1-202.01(f), 1-202.04(g), 1-204.22(3), 1-207.13(c) and (d), and 1-207.14(c), guarantee certain benefits to incumbent employees of the District of Columbia government and those persons transferred to the District of Columbia government from the formerly independent National Capital Housing Authority, District of Columbia Redevelopment Land Agency and the District of Columbia Department of Manpower including, without limitation, benefits relating to appointments, promotions, discipline, separation, pay, unemployment, compensation, health, disability and death benefits, leave, retirement, insurance, and veterans preference.

D.C. Code § 1-602.04 (2006 Repl.) establishes the status of those employees employed by the District of Columbia government on the date the CMPA became

In the Matter of Allan E. Lucas, Jr., Annuitant                    P a g e | 6

effective as provided in § 1-636.02.  It also addresses retention of the employees' existing rights.  More specifically, it states:

(a)     Persons employed by the District of Columbia government serving on the date that this chapter becomes effective, as provided in § 1-636.02, shall be guaranteed rights and benefits at least equal to those currently applicable to such persons under provisions of personnel law and rules and regulations in force on the date immediately prior to the date that this chapter becomes effective as provided in § 1-636.02.

(b)     All provisions of existing contracts between the District government and labor organizations shall be honored until their expiration.

(c)     On January 1, 1980, all persons employed by the District of Columbia government, including those persons employed by the District of Columbia government on the date that this chapter becomes effective as provided in § 1-636.02, shall automatically transfer into the appropriate personnel system established pursuant to subchapters VIII and VIII-A of this chapter or § 1-609.09.  The classification and compensation for the position assumed upon transfer, and the rights and benefits inhering in such position, shall be at least equal to the classification, compensation, rights and benefits associated with the position from which said employee is transferred.  The rights and benefits protected under this subsection shall be only those applicable to said employees under the provisions of personnel laws and rules and regulations in force on December 31, 1979; Provided, however, that no employee covered under the provision of this subsection shall be reduced in pay except as provide in subchapter XXIV of this chapter.

(d)     After January 1, 1980, persons employed by the District of Columbia government on the date that this chapter becomes effective as provided in § 1-636.02 and who transfer into the appropriate personnel system, pursuant to subsection (c) of this section, shall be governed by the provisions of this chapter, with the exception of subsection (e) of § 1-608.01 and subsection (d) of § 1-608.01a.

(e)     Employees hired on or after the date that this chapter becomes effective as provided in § 1-636.02 shall be governed by all the provisions of this chapter without exception.

On the other hand, the D.C. Police and Firefighters' Retirement Board ("PFRRB") was created under a separate and distinct statutory provision, and its duties are fairly limited in scope.  D.C. Official Code § 5-721 (a) states:

a)     The Mayor shall consider all cases for the retirement of members and all applications for annuities under this subchapter subject to review and final determination by the District of Columbia Retirement Board.  In each case of retirement of a member the Mayor shall certify in writing the physical condition of the member for whom retirement is sought.  The Mayor shall give written notice to any member under consideration by him for retirement to appear before

him and to give evidence under oath. The proceedings before the Mayor involving the retirement of any member, or any application for an annuity under this subchapter, shall be reduced to writing and shall show the date of appointment of such member, his age, his record in the service, and any other information which may be pertinent to the matter of such retirement or annuity. . . .

Further, a Member of the Police and Firefighters' Plan is defined in D.C. Official Code § 5-701(A) as :

[A]ny officer or member of the Metropolitan Police force, of the Fire Department of the District of Columbia, of the United States Park Police force, of the United States Secret Service Uniformed Division, and any officer or member of the United States Secret Service Division to whom this subchapter shall apply, but does not include an officer or member of the United States Park Police force, of the United States Secret Service Uniformed Division, or of the United States Secret Service Division, whose service is employment for the purposes of title II of the Social Security Act and chapter 21 of the Internal Revenue Code of 1986, and who is not excluded from coverage under chapter 84 of title 5, United States Code, by operation of 8402 of such title.

In addition, D.C. Official Code § 5-706(b)(2) states:

Any member who is an officer or member of the Metropolitan Police force or the Fire Department of the District of Columbia with less than 5 years of police or fire service who is separated from his department, except for retirement under § 5-709, § 5-710, or § 5-712, shall be refunded the amount of the deductions made from his salary under this subchapter. The receipt of payment of such deductions by such member *shall void all annuity rights under this subchapter,* except that if such member is subsequently reappointed to any department whose members come under this subchapter and such member elects, at the time of such reappointment, to redeposit the amount refunded to him pursuant to the preceding sentence plus interest computed in accordance with § 5-717(c), then credit shall be allowed under this subchapter for the prior period of service. Such redeposit (and the interest required thereon) may be made, at the election of the member, in a lump sum or in not to exceed 60 monthly installments, except that if such member dies before depositing the full amount due under the preceding sentence, the requirements of such sentence shall be deemed to have been met. *(Emphasis added)*

Clearly, the statutory language above does not delegate personnel authority to the PFRRB. The sole purpose of the PFRRB is to determine whether a Member is *eligible* to retire, and whether he is eligible to receive an annuity based on his years of service to his department. PFRRB also determines if an active member has incurred a disability in the performance of his duties with the department. Therefore, determining whether the Annuitant is entitled to additional creditable service is purely a personnel function, well outside the scope of the authority of the PFRRB.

On the other hand, Mayor's Order 2008-81, dated June 5, 2008, delegates joint personnel authority in the area of recruitment and selection for all Career, Legal and Management Supervisory Service positions to the D.C. Department of Human Resources and the heads of certain covered agencies, including, but not limited to, the D.C. Metropolitan Department. This Order specifically vests authority in the DCMPD to "appoint, assign to duty, and promote all officers and members of the DCMPD as provided in D.C. Official Code § 5-105.04 (2006 Repl.).[3] This order was subsequently amended by Mayor's Order 2009-117, on June 19, 2009, and DCMPD was delegated joint personnel authority for purposes of "personnel and rulemaking authority vested in the Mayor over officers and members of the MPD under D.C. Code §§ 1-604.04 and 1-604.06 (2006.)". This language was inadvertently omitted from Mayor's Order 2008-81. Thus, the issue of whether or not Annuitant was entitled to re-appointment to the Department upon the completion of his military service, and consequently, entitled to additional creditable service, is a personnel function solely within the province of the DCMPD as set forth in Mayor's Orders 2008-81 and 2009-117.

## ANALYSIS

Annuitant makes two arguments in support of his position that he should be awarded creditable time for the period he served with the Department from May 1, 1972, through January 1, 1973. First, he argues that the Department committed a "key error and/or omission" when it failed to provide him with a military furlough, "knowing that [he] was leaving Federal service to enter the Armed Forces during a time of war." He maintains that the Department failed to counsel him regarding his rights; that the Department should have advised him that he had a right to take a military furlough instead of resigning from his position with the Department. Second, Annuitant asserts that the "downward adjustment of his pension . . . was a "direct result of the [Department's] failure to grant a military furlough and to restore [him] to uniformed service as required by Federal law."

The documents Annuitant presented for review reflect that he was first employed with the District of Columbia Government in 1972. A copy of a Personnel Action Form, dated April 28, 1972, indicates the Annuitant was appointed to the position of, police cadet, GS 301, Grade 2, Step 1, with an annual salary of $5,510.00, effective May 1, 1972. This document reflects that Annuitant was a probationary employee, in a Career Conditional appointment, for D.C. Government only. It also notes that he was placed in the "CS Retirement" category. A copy of a second document, dated May 30, 1973, indicates that Annuitant voluntarily resigned from DCMPD, approximately seven months later, while still a probationary employee. The resignation was effective January 20, 1973. Again, Annuitant is listed as enrolled in the "CS Retirement" system.[4] This document also states that Annuitant was employed full-time, and a "termination code" number "5" was placed in the box, denoting military. Under the Section for "Remarks", a typewritten entry was made which states:  "Reason to enter the armed services. . . .

---

[3] Mayor's Order 2008-81 rescinded prior Mayor's Orders 97-88, 2007-237, and 2008-13, pertaining to the joint delegation of personnel authority.
[4] The document was highlighted to reflect that in addition to the CS Retirement system the Member was in the Police/Fire" retirement system. [Take a second look - - was merely underlined].

Forms issued SF55 and unemployment compensation sheet pay leave." On the reverse side of this document, under the section titled "Separation Data", a handwritten "x" is placed in the box beside the words "during probation". A handwritten note, also states: Reason:  to enter the armed forces." The record reflects Annuitant was subsequently enrolled in the U.S. Marine Corps for at least two tours of duty, from January 2, 1973 through February 13, 1975, and from February 14, 1975, through February 3, 1978, a total of five (5) years and one (1) month. According to another document submitted for review, Annuitant was honorably discharged from both tours of duty.

On February 15, 1978, upon his discharge from the military, Annuitant purportedly submitted a handwritten letter to DCMPD which indicated he is a "disabled veteran" and requesting reinstatement. He specifically wrote he "wished to have his job again." Ostensibly, Annuitant requested reinstatement in his former position as a probationary police cadet. Accompanying this letter was a response from DCMPD, dated "Feb. 17, 1978" which denied Annuitant's request. It bears a handwritten notation, to wit:  "not recom------," followed by a signature of "Sgt. Donald H. Christian," and a handwritten date of "02/18/78" below the signature.

According to the Certified Summary of Federal Service, Civil Service Retirement System, Annuitant was subsequently hired by the National Gallery of Art on March 12, 1978. He resigned from that federal agency on March 26, 1978. Annuitant was also employed with the U.S. Marshal Service (April 2, 1980 through September 18, 1982), followed by two additional tours with DCMPD (September 20, 1982 through July 14, 1984, and March 18, 1985 through September 18, 1993). This position was subject to completion of an eighteen month probationary period. Annuitant was notified that since he was a non-District resident, his appointment with the Department was contingent upon him complying with the residency requirement. The final position held by Annuitant was as a Correctional Officer, with the D.C. Department of Corrections (hereinafter referred to as "Corrections"). This was a Career appointment, effective April 18, 1994. Annuitant voluntarily retired from this position on May 16, 2005.

The Military Selective Service Act of 1967, previously codified at 50 U.S.C. App. § 459(b), was in effect during the time Annuitant resigned his position with the Department to enter the military. The Military Selective Service Act provided reemployment rights to those service members who left their civilian positions to enter the military. In order to benefit from this statute, civilians were required to give advance written or verbal notice to their employers of their upcoming military service. In addition, to be eligible for reemployment they had to receive an honorable discharge from the military.

The Military Selective Service Act was subsequently replaced by the Veterans Reemployment Rights Act ("VRRA"), previously codified at 38 U.S.C.A. §§ 2021 et seq. The VRRA was in effect at the time Annuitant was discharged from the Marine Corps. Both of these statutes have been replaced by the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA") which added some additional substantive provisions to strengthen the law, as well as provide more clarity and simplify the rights of the veterans.

The VRRA provisions are still applicable to the Annuitant's case which arose before the 1994 effective date of USERRA. *See Fernandez v. Dep't of the Army*, 234 F.3d, 553, 557 (Fed. Cir. 2000). One court held that the retroactive application of USERRA is prohibited to cases which occurred prior to 1994 because it could "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280, 114 S. Ct. 1483 (1994).

Like its predecessor, the statutory provisions of the VRRA mandate re-employing individuals in the positions they held prior to their military stint and awarding them the perquisites associated with those jobs, provided it is reasonably certain the individual would have received them. Furthermore, upon reemployment the individual is to be treated as not having a break in service for purposes of participation in a pension plan. VRRA establishes specific rights for reemployed service members. Presumably this covers employee pension benefit plans maintained by an employer that provide retirement income covered by the plan. Once a member of the pension plan is reemployed, he is treated as if there were no break in coverage. It is treated as an uninterrupted period of employment with the employer for purposes of calculating pension.

In the event, the employee has sustained a service-connected disability, an additional requirement may be imposed upon the employer to determine if the employee can be brought back to the Department in his original position with reasonable accommodations. If the employee is unable to perform his duties with accommodations, the employer must determine if the employee can be placed in an "equivalent" position for which he is qualified. If not, the employer has an obligation to look at whether an alternative position can be identified, and which actually exists, in which the employee should be considered. It is incumbent upon the employer to conduct this type of analysis in order to protect the rights of returning veterans. The answers to these questions and many cannot be answered in that more than

Annuitant was obligated to notify the Department that he was seeking reemployment upon completing his service with the U.S. Marine Corps, and in fact was obligated to submit an "application for reemployment" no later than 90 days after completion of his service, or within two years if the member was hospitalized or spent time convalescing from an illness or injury incurred in the performance of service in the uniformed services. It is not clear from the documents submitted to the undersigned if the Annuitant complied with these requirements. This is information known only to the appropriate personnel authority, DCMPD. The copy of the letter Annuitant purportedly submitted to the Department on February 15, 1978, may not necessarily qualify as an "application for reemployment." The alleged "denial" by the Department, as set forth in the copy of the letter dated "Feb 18, 1978", bearing the signature Sgt. Donald Christian, may not necessarily qualify as a "denial" of reemployment. In any event, the reasons or basis for the "denial" are not contained within the four corners of the document. These reasons are ostensibly known only to Sgt. Donald Christian, someone who was employed with the Department more than 34 years ago. Additionally, there is no record of the

In the Matter of Allan E. Lucas, Jr., Annuitant                                    P a g e | 11

Annuitant appealing Sgt. Christian's decision to a higher authority.   There is only a record of the Annuitant being reemployed with the Department some 4 ½ years later on September 20, 1982.   No evidence or records were presented to establish whether Annuitant was advised of his rights as they pertain to his pension.   Annuitant served approximately 22 months with the Department before he resigned on July 14, 1984.

The Annuitant was reemployed with the Department on March 18, 1985, and served for another 8 ½ years before he resigned for the third and final time on September 18, 1993. Again, no evidence was presented to establish if he was advised of his rights as they pertain to his pension.   However, information obtained from DCRB indicate the Annuitant withdrew his retirement contributions, thereby nullifying his entitlement to a pension/annuity calculated based on funds received during this time period.  Although, Annuitant is entitled to creditable time for these periods of service, his pension was subject to a reduction because of this withdrawal. There is no record that the Annuitant re-deposited the withdrawn amounts into his retirement account.

The question arises whether the Annuitant acted in a timely manner in pursuing this claim against the District. Arguably, he has not. Annuitant's claim is time-barred pursuant to the doctrine of *laches*. Annuitant argues that he did not know that he was being denied creditable service for the time he served in DCMPD in 1972-1973, and for the period he served in the military, until he received a special notice of from OPM, dated February 5, 2007, reducing his annuity.   However, this assertion is contrary to the evidence.   The Annuitant attempted to exercise his rights pursuant to the Military Selective Service Act or VRRA when he wrote a letter to the Department in February 1978 requesting re-employment.   Upon receipt of the letter from Sgt. Christian dated February 18, 1978, the Annuitant was placed on notice that he may have been "denied" his rights pursuant to the federal statute.   It was at this point in time, more than 34 years ago, that the Annuitant was under an obligation to pursue his rights. Instead, the Annuitant chose to find employment outside the District Government.

In fact, the Annuitant was reemployed with the Department in September 1982, more than 4 ½ years after he was "denied" employment in 1978.   The Annuitant knew, or should have known, that he may have had a claim against the Department at that time. However, there is no record that he pursued this matter with the Department at that time. He resigned in July 1984. After a hiatus of approximately eight months, the Annuitant was reemployed with the Department a third time in March 1985.  Again, there is no record of him pursuing the matter regarding his pension. And once again, the Annuitant resigned his position with the Department.

Because more than 32 years passed before the Annuitant sent letters to the DCRB and the PFRRB seeking additional creditable service, the Department has been prejudiced by his unreasonable delay and negligence.  This failure on his part to pursue his claim in either "1973" or "1978," for whatever reasons, are known only to him.  The Annuitant committed an unreasonable delay in failing to assert his rights with regard to this issue, thereby causing prejudice to the employer.  For example, it has been more than 30 years since DCMPD decided not to reemploy the Annuitant in 1978. Thus, the whereabouts of potential Department witnesses is unknown, and crucial evidence may have been lost

Counsel's reliance on *Staub v. Proctor Hospital*, 131 S. Ct. 1186 (2011), is misplaced. In that case the petitioner alleged that he was discharged from his employment because his supervisors were openly hostile to him because of his military reservist obligations. Petitioner was terminated from his job and immediately filed a grievance with his employer based on discriminatory treatment. The Court noted that USERRA was similar in nature to Title VII which prohibits employment discrimination on a variety of bases. The Court held:

> [I]f a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA. *(footnotes omitted)*

Unlike the petitioner in *Staub*, the record is devoid of any evidence of "motivating factors" on the part of the Department to discriminate against Mr. Lucas by not restoring him to his previous employment with the Department as a police cadet. The reasons the Department did not reemploy Mr. Lucas in February 1978 are known only to the parties involved in the Department's hiring practices at that time. Thus, there is no evidence of an adverse action being taken against Mr. Lucas.

Similarly, counsel's reliance on *King v. St. Vincent's Hospital*, 502 U.S. 215 (1991), is also misplaced. In that case, the petitioner, a National Guard member, i.e., a reservist, immediately notified his employer that he had accepted a 3-year full-time appointment with the Guard, and requested a leave of absence. The employer denied his request on the basis that the length of time the petitioner requested was unreasonable. The Supreme Court analyzed whether 38 U.S.C. 2024(d) implicitly limits the length of military service after which a member of the Armed Forces retains a right to civilian reemployment. It held that it does not. The Court noted that the statute was silent on the matter, but that other provisions in section 2024 imposed explicit time limitations on enlisted servicemen and active duty members; however, it did not do so with regard to reservists. Ultimately, the Court determined that the petitioner's leave request was reasonable and protected by the VRRA. No evidence has been presented to establish that Mr. Lucas informed the Department that he requested a four or five year leave of absence in order to perform service with the Armed Forces, and that the Department found his request unreasonable.

Section 2022 of the VRRA was amended in 1974 to provide that no state statute of limitations is applicable to any proceedings under the Act. Prior to 1974, some courts were actually applying state statute of limitations. *See Gruca v. United States Steel Corp.*, 495 F.2d 1252 (1974, CA3 Pa) (the veteran delayed more than 9 years in bringing his case; 6 year statute of limitations imposed). They also employed the *doctrine of laches* both before and after the amendment to Section 2022. *See Goodman v. McDonnell Douglas Corp.* 606 F.2d 800 (1979, CA8 Mo.), *cert den.*, 446 U.S. 913, (year); *Churma v. United States Steel Corp.* 514 F.2d 589, (1975, CA3 Pa)

In the Matter of Allan E. Lucas, Jr., Annuitant                                    P a g e | 13

Mr. Lucas bears the burden of proving any equitable reasons he has for failing to raise this matter in a timely manner. He chose to focus on the date of the receipt of his *Special Notice* from the U.S. Office of Personnel Management ("OPM"), which is dated February 5, 2007, as the date he first became aware that his annuity had been substantially reduced because he was not reemployed by the Department in 1978 when he returned from serving time with the U.S. Marine Corps. At that time, OPM advised Mr. Lucas that he must file a request for reconsideration within 30 days of the date of its notice. This was essential to preserve any appellate rights he may have to the U.S. Merit Systems Protection Board ("MSPB"), however, there is no evidence to show that he complied with this mandate.

Although, Mr. Lucas would have us believe that he pursued this matter in a timely manner, the fact remains that the underlying action that precipitated his current request took place more than 30 years ago. Mr. Lucas failed to act reasonably and exercise due diligence when he failed to follow up on the Department's "recommendation" not to reemploy him, thereby unequivocally waiving his reemployment rights. There are a number of potential and very critical pitfalls associated with trying to investigate the facts and circumstances surrounding this matter, more than three decades after their alleged occurrence. First, and foremost, the individuals who worked for the Department, including but not limited to Donald H. Christian, Sergeant, Squad #2, Addison L. Davis, Commanding Officer for the Recruiting Branch, and Laurence J. Wade, Investigator for the Recruiting Branch, are no longer employed with the Department.

Second, the individuals who signed Mr. Lucas' Personnel Action Form 52 in "1973" may no longer be with Department. The Department may have wished to dispute the allegations made by Mr. Lucas and bring forth an array of witnesses and documents known only to their agency. Alternatively, witnesses and documents that would shed light on this matter may have been lost over the past 30 years.

Third, there are a number of other factors to be addressed in the event the Department seeks to hire or reemploy a former employee. For example, there may be a dispute regarding the disability Mr. Lucas alluded to in his correspondence to the Department. Annuitant would have had to meet the appropriate physical and mental fitness standard requirements of the day, as well as successfully complete the D.C. Police Cadet Training Program. He would also have had to successfully pass a background investigation. These factors were important thirty years ago and would have to have been addressed by the appropriate hiring personnel in February 1978.

In any event, allowing a claim in this matter to go forward after more than three decades have passed, would be extremely prejudicial to the Department at this late date. The *doctrine of laches* bars any claim in this matter because of Mr. Lucas' unreasonable delay in pursuing this matter, more than 30 years later.

Furthermore, the fact that Mr. Lucas was reemployed by the Department during two intervening periods raises the question of whether either of them addressed the reemployment issue of "1973" and "1978" when Mr. Lucas was hired in 1982 and/or

In the Matter of Allan E. Lucas, Jr., Annuitant                                    P a g e | 14

1986, including, whether the parties had any dialogue or discussion surrounding Mr. Lucas' pension.

For all of the foregoing reasons, I have determined that the D.C. Police and Firefighters' Retirement and Relief Board has no jurisdiction in this matter. Nor does the Board possess any statutory or regulatory authority to decide personnel issues, such as determining Mr. Lucas' right to any benefits pursuant to the VRRA and USERRA.

Sincerely,

Pamela A. Brown
Assistant Attorney Advisor

PAB\